```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
```

COCKETT MARINE OIL LIMITED                        CIVIL ACTION

v.                                                NO. 11-464

M/V LION, her engines, tackle,                    SECTION "F"
appurtenances, etc., *in rem*, and
CHARBONS ET FUELS UK, Ltd.,
CHARBONS & FUELS, SAS,
ELMAR SHIPPING CO., S.A., and
EVANDROS NAVIERA, *in personam*

                        ORDER AND REASONS

Before the Court is defendant Evandros Compania Naviera SA, Panama's motion to vacate the arrest and attachment of the M/V LION. For the reasons that follow, the motion is GRANTED.

### **Background**

This admiralty and maritime case concerns a United Kingdom-based global marine fuel supplier's attempt to recover a debt arising from the supply of fuel oil bunkers in Russia to a Greek-flagged vessel, the M/V LION, which was owned by a Panamanian company, managed by a Greek company, and chartered by a United Kingdom-based company.

The M/V LION is an ocean-going bulk cargo carrier flying under the flag of Greece; it is owned by Evandros Compania Naviera SA, Panama, managed by Elmar Shipping Co. SA, and during the relevant time, was chartered to Charbons Et Fuels UK Limited pursuant to a charter party dated October 11, 2010. Charbons Et Fuels UK Limited was obligated by the charter party to provide and pay for the fuel

for the vessel.

On January 18, 2011 Cockett Marine Oil Limited supplied bunker fuel to the M/V LION in the port of Murmansk, Russia. The agreement between Cockett and Charbons Et Fuels SA for the sale and delivery of the bunkers was subject to Cockett's standard terms and conditions;[1] neither the vessel's owner or manager was a party to the fuel supply agreement. Cockett's Standard Terms and Conditions applicable to the sale of marine bunker fuels contains a liens provision:

> 10.0 LIENS Where Product is supplied to a Vessel, in addition to any other security, the Agreement is entered into and Product is supplied upon the faith and credit of the Vessel, it is agreed and acknowledged that a lien over the Vessel is thereby created for the Price of Product supplied and that the Company in agreeing to deliver Product to the Vessel does so relying upon the faith and credit of the Vessel. The Buyer, if not the owner of the Vessel, hereby expressly warrants that he has the authority of the owner to pledge the Vessel's credit as aforesaid and that he has given notice of the provisions of this Clause to the owner. The Company shall not be bound by any attempt by any person or entity to restrict, limit or prohibit its lien or liens attaching to a Vessel unless notice in writing of the same is given to the Company before it sends its Confirmation to the Buyer....

The Standard Terms and Conditions also contains a choice of law provision, in which the contracting parties chose English law to govern all disputes:

---

[1] As such, according to Evandros, Evandros was not a party to the sale agreement and had no notice of the bunker sale or delivery for over a month after it occurred.

> 21.0 JURISDICTION The Agreement and all claims and disputes arising under or in connection with the Agreement shall be governed by English law and any dispute arising out of or in connection with the Agreement shall be subject to the exclusive jurisdiction of the English Courts. So however that nothing in this Clause shall, in the event of a breach of the Agreement by the Buyer, preclude the Company from taking any such action as it shall in its absolute discretion consider necessary, the Company shall have the power to enforce a judgment of the English Courts (whether or not subject to appeal), safeguard and/or secure its claim under the Agreement in any court or tribunal or any state or country.

The invoice issued by Cockett to Charbons Et Fuels SA provides that the $236,600 fuel cost must be paid within 30 days from the date of delivery. Cockett maintains that it has not been paid.

Upon learning that the M/V LION was in the Port of New Orleans, on February 25, 2011, Cockett sued the M/V LION, *in rem*, Charbons Et Fuels UK, Ltd., Charbons & Fuels, SAS, Elmar Shipping Co. S.A., and Evandros Naviera, *in personam*.[2] Cockett asserts an *in rem* claim against the vessel, in which it seeks to enforce a maritime lien for necessaries; Cockett also asserts *in personam* claims for breach of contract or, alternatively, for conversion or

---

[2]According to the allegations of the verified complaint: Charbons Et Fuels UK Ltd. is a foreign corporation existing under the laws of, and having its principal place of business located in, the United Kingdom; Charbons & Fuels SAS is a foreign corporation existing under the laws of, and having its principal place of business located in, France; Elmar Shipping Co. S.A. is a foreign corporation existing under the laws of, and having its principal place of business located in, Greece; Evandros Naviera is a foreign corporation existing under the laws of, and having its principal place of business located in, Panama.

unjust enrichment against Evandros, Elmar, and Charbons.[3]  Along with the verified complaint, Cockett also requested that the Court issue an arrest warrant for the M/V LION.  Based on the allegations of the verified complaint and, pursuant to Rules B and C of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the Court issued an arrest warrant that same day; a writ of foreign attachment also issued.  The U.S. Marshals then arrested the M/V LION; an order permitting movement of the arrested vessel was issued the next day.  Evandros posted security to obtain the release of the vessel; an order granting the motion for leave to file the $325,000 release bond was granted, and the M/V LION was released on March 2, 2011.

Evandros Compania Naviera SA, Panama, making a restricted appearance under Supplemental Rule E(8) as owner and claimant of the M/V LION and with full reservation of all rights and defenses, now seeks to vacate the warrant of arrest and writ of attachment issued on February 25, 2011 against the M/V LION on the grounds that Cockett Marine Oil Limited does not possess a maritime lien against the vessel under U.S. law, Russian law, or English law, and has no claim *in personam* against Evandros, and is, therefore, not entitled to proceed against the M/V LION *in rem* or *in personam*.[4]

---

[3] Cockett filed a verified first supplemental and amending complaint on March 17, 2011.

[4] The parties dispute whether Elmar has made a Rule E(8) restricted appearance sufficient to consider the motion to vacate

I.
Standard Applicable to Motion to Vacate

The special remedies and procedures available to admiralty and maritime claimants are governed by the Supplemental Rules for Admiralty or Maritime Claims, as part of the Federal Rules of Civil Procedure. Rule E(4)(f) of the Supplemental Rules for Admiralty and Maritime Claims calls for a prompt, post-attachment and post-arrest hearing in proceedings under Supplemental Rules B and C.[5]

---

to be pursued by Elmar as well. Because Elmar did not join in the initial moving paper and has apparently not made a Rule E(8) restricted appearance, the Court considers this motion to be pursued by Evandros alone. Elmar must file its own papers adopting Evandros's arguments, if necessary.

[5]Supplemental Rule B concerns the attachment and garnishment procedure available in the context of *in personam* actions:
> (a) If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required...are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property...in the hands of the garnishees named in the process.
> (b) The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that...the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment....

Fed.R.Civ.P.Supp.R. B. See also In re Murmansk Shipping Co., No. 00-2354, 2001 WL 699530, at *2 (E.D. La. June 18, 2001)("[i]n considering the propriety of an attachment, the court's inquiry is limited to an assessment of whether the underlying complaint alleges an *in personam* action grounded in maritime law and whether

Pursuant to Supplemental Rule E(4)(f), a person claiming an interest in property arrested or attached is entitled to a hearing "at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed.R.Civ.P.Supp.R. E(4)(f). To carry its burden, the arresting or attaching party must present sufficient evidence to show that there were "reasonable grounds" for attachment and that the arrest is supported by "probable cause." See Diesel Specialists, LLC v. M/V MOHAWK TRAVELER, No. 09-2843, 2009 WL 1036085, at *1 (E.D. La. April 17, 2009)(Engelhardt, J.); see also In re Murmansk Shipping Co., No. 00-2354, 2001 WL 699530,

---

the attachment was necessary to effectuate jurisdiction").
       Supplemental Rule C, governing *in rem* actions, permits a plaintiff to initiate an *in rem* action against a vessel to enforce a maritime lien. See  Fed.R.Civ.P. Supp. R. C(1)(a) (further providing that a party who may proceed *in rem* may also, or in the alternative, proceed *in personam* against any person who may be liable). Supplemental Rule C's technical requirements include:
    (2) Complaint.  In an action *in rem* the complaint must:
        (a) be verified;
        (b) describe with reasonable particularity
            the property that is the subject of the
            action; and
        (c) state that the property is within the
            district or will be within the district
            while the action is pending.
    (3) Judicial Authorization and Process.
        (a) Arrest Warrant.
          (i) The court must review the complaint and
            any supporting papers.  If the conditions for
            an *in rem* action appear to exist, the court
            must issue an order directing the clerk to
            issue a warrant for the arrest of the
            vessel...
Fed.R.Civ.P. Supp.R. C.

6

at *2 (E.D. La. June 18, 2001)(Vance, J.).

If the Court determines that the arrest or seizure was wrongful, damages may be recoverable: the burden is on the party pursuing a claim for wrongful arrest to demonstrate that the arresting party acted with "bad faith, malice, or gross negligence."  See <u>Marastro Compania Naviero v. Canadien Maritime Carriers, Ltd.</u>, 959 F.2d 49, 53 (5th Cir. 1992).

## II.

A. Rule C *in rem* arrest of the M/V LION

Evandros first contends that Cockett cannot show that the vessel's arrest was supported by probable cause; that is, because Cockett does not have a maritime lien against the M/V LION, it is therefore not entitled to proceed *in rem* against the vessel.  The Court agrees.

A maritime lien is a special property right in a vessel that gives the lien-holder priority over some claimants.  See <u>Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.</u>, 346 F.3d 552, 556 (5th Cir. 2003).  Because a maritime lien "arises in favor of the creditor by operation of law", it cannot be created by contract. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Bominflot, Inc. v. THE M/V HENRICH S</u>, 465 F.3d 144, 147 (4th Cir. 2006)("[a]dopted from civil law, maritime liens are stricti juris and cannot be created by agreement between the parties; instead, they arise by operation of law, often depending on the nature and object of the contract").  As the Fourth Circuit

Court of Appeals has observed: "Because maritime liens confer such a powerful right, most nations–including England–limit or preclude their application." Bominflot, 465 F.3d at 147.  With regard to claims for necessaries, including bunkers, very few countries, such as the United States and France, recognize a maritime lien. See Marine Oil Trading Ltd. v. Motor Tanker Paros, 287 F. Supp. 2d 638, 644-45 (E.D. Va. 2003).  Accordingly, whether Cockett is entitled to a maritime lien against the M/V LION such that it can maintain its Rule C claim, turns on which law controls: if U.S. law applies, then Cockett likely could maintain a lien for necessaries;[6] if English law applies, however, then no such maritime lien exists for necessaries and its Rule C claim fails.

Because Cockett's Standard Terms and Conditions applicable to its provision of necessaries to the M/V LION on behalf of Charbons Et Fuels SA provides a jurisdiction clause that chooses English

---

[6]The Commercial Instruments and Maritime Lien Act (formerly known as the Federal Maritime Lien Act) provides:
> A person providing necessaries to a vessel on the order of the owner or a person authorized by the owner–
> (1) has a maritime lien on the vessel;
> (2) may bring a civil action in rem to enforce the lien; and
> (3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342.

Evandros insists that, even if U.S. law applies, Cockett could not maintain its Rule C claim because no lien would arise here, where a foreign supplier of goods services a foreign-flagged vessel in a foreign port.  The Court need not address this assertion because Cockett chose English law to govern the necessaries contract.

law, the Court need not indulge a choice of law analysis.[7]  While it is clear that the parties to the contract for provision of bunkers chose English law (and indeed that Cockett was the drafter of the Standard Terms and Conditions making the selection of English law), there is other language in the contract that requires further analysis.

The final paragraph of Cockett's Standard Terms and Conditions provides that "[t]he Agreement and all claims and disputes arising under or in connection with the Agreement shall be governed by English law and any dispute...shall be subject to the exclusive jurisdiction of the English Courts."  This general choice of law provision quite clearly chooses English law to govern disputes arising out of Cockett's provision of bunkers.  However, there's more to the Jurisdiction Clause: "So however that nothing in this Clause shall, in the event of a breach of the Agreement by the Buyer, preclude the Company from taking any such actions as it shall in its absolute discretion consider necessary, the Company shall have the power to enforce a judgment of the English Courts..., safeguard and/or secure its claim under the Agreement in any court or tribunal or any state or country."  This portion of the Jurisdiction Clause expands Cockett's right to bring its claims in a forum other than the English courts.  But it does not affect

---

[7]The Court notes that both sides seem to agree, although for different reasons, that a choice of law analysis is unnecessary.

the choice of law provision. Cockett argues, however, that another provision of its Standard Terms and Conditions does affect the general choice of English law; the LIENS provision:

> Where Product is supplied to a Vessel, in addition to any other security, the Agreement is entered into and Product is supplied upon the faith and credit of the Vessel, it is agreed and acknowledged that a lien over the Vessel is thereby created for the Price of Product supplied and that the Company in agreeing to deliver Product to the Vessel does so relying upon the faith and credit of the Vessel. The Buyer, if not the owner of the Vessel, hereby expressly warrants that he has the authority of the owner to pledge the Vessel's credit as aforesaid and that he has given notice of the provisions of this Clause to the owner. The Company shall not be bound by any attempt by any person or entity to restrict, limit or prohibit its lien or liens attaching to a Vessel unless notice in writing of the same is given to the Company before it sends its Confirmation to the Buyer....

To the extent that Cockett submits that this provision reserves the right to obtain a lien on a vessel (as indeed it purports to do), other courts have refused to permit the general lien language (which itself cannot give rise to a maritime lien) to trump an unqualified English choice of law provision. See Bominflot, Inc. v. THE M/V HENRICH S, 465 F.3d 144 (4th Cir. 2006)(holding that English law applied to seller's claim of a maritime lien against vessel that purchased fuel oil bunkers, noting that "[w]ere we to conclude otherwise, we would allow [the plaintiff] to escape its own choice of law clause through the ambiguity and sloppiness of other [contractual] provisions"); see also Marine Oil Trading Ltd. v. MOTOR TANKER PAROS, 287 F. Supp. 2d 638, 644-45 (E.D. Va. 2003)(analyzing similar contract terms, including a choice of

10

English law, and noting the existence of a separate liens provision, but holding that English law should apply to determining the existence of a maritime lien including because ambiguity in a contract is to be construed against the drafter and "there is no language signaling an intent to invoke the specific maritime lien law of a particular forum"); see also Marine Oil Trading Ltd. v. M/V SEA CHARM, No. 02-2281, 2003 WL 292309, at *6 (E.D. La. Feb. 10, 2003)(Berrigan, J.)(granting summary judgment in favor of the owner of the *in rem* defendant, noting that the contract for fuel oil bunkers did not provide for an express modification respecting choice of law); see also Ocean Marine Mut. Ins. Assoc. (Europe) O.V. v. M/V LIA, No. 99-2515, 1999 WL 679671, at *3-4 (E.D. La. Aug. 27, 1999)(Sear, J.)(vacating vessel arrest when confronted with similar contractual language, noting that "[n]othing in [this contract] carves out an exception for maritime lines to the clear choice of law provisions...selecting English law, or indicates, in any way, that Plaintiff...agreed that United States law governs the creation of maritime liens"). The Court finds these authorities persuasive; because Cockett has not shown that English law is inapplicable, it has failed to carry its burden to show probable cause for the arrest of the M/V LION.[8]  Accordingly, because

---

[8]In attempting to support its assertion that this Court should apply local law to determine whether a maritime lien existed, Cockett invokes Liverpool and London Steamship Prot. and Indem. Assoc. v. QUEEN OF LEMAN M/V, 296 F.3d 350 (5th Cir. 2002). However, Cockett omitted the feature of the contract in that case

Cockett has not shown probable cause for the arrest of the M/V LION, the arrest must be vacated and its Rule C claim must be dismissed.

    B.   Rule B *in personam* attachment

Cockett contends that "only in the event that this Court were to conclude that the lien is not authorized" the Court should consider Cockett's *in personam* claim against the defendants for breach of contract and conversion/unjust enrichment. Evandros contends that Cockett has failed to plead a prima facie case for *in personam* liability based on breach of contract and conversion/unjust enrichment. The Court agrees.

Regarding Cockett's breach of contract claim, Cockett's first

---

that distinguishes it from this case and the other district court cases cited by this Court. In QUEEN OF LEMAN, the choice of law provision provided that English law generally governed the contract, the contract chose the English High Court of Justice as its choice of forum (with the qualification that nothing prejudice the plaintiff's right to "commence proceedings in any jurisdiction to enforce its right of lien on ships or to otherwise obtain security by seizure, attachment, or arrest of assets for any amounts owed to" the plaintiff. Id. at 353. However, the contract's lien provision stated that the plaintiff would have a "lien on ships" and then specifically provided for the application of local law, in stating that the application of English law was subject "to the right of the [plaintiff]... to enforce its right of lien in any jurisdiction in  accordance with local law in such jurisdiction." Id. at 353. This Court agrees with the other courts that have determined that the Standard Terms and Conditions at issue here are materially different from the contract terms in the QUEEN OF LEMAN. See Bominflot, Inc. v. THE M/V HENRICH S, 465 F.3d 144 (4th Cir. 2006); see also Marine Oil Trading Ltd. v. MOTOR TANKER PAROS, 287 F. Supp. 2d 638, 642-645 (E.D. Va. 2003); see also Marine Oil Trading Ltd. v. M/V SEA CHARM, No. 02-2281, 2003 WL 292309, at *4-7 (E.D. La. Feb. 10, 2003).

amended complaint alleges no link between Evandros and the failure to pay for the supply of bunker fuel.  And Cockett has failed to show that the marine fuels invoice, which is specifically addressed to the Charbons entity that did not charter the M/V LION, or any of the other evidence Cockett has submitted to support its breach of contract claim, created an agreement between Cockett and Evandros sufficient to sustain a breach of contract claim.  Cockett maintains that it has satisfied the Rule 8 notice pleading requirements and that its allegations would survive a Rule 12(b)(6) challenge.  The Court disagrees.

Regarding the conversion/unjust enrichment claim against Evandros, Cockett alleges at paragraphs XXIV and XXV of its amended complaint:

> Upon information and belief, the charter party between Evandros and/or Elmar and Charbons UK and/or Charbons France for the M/V LION terminated between the time the vessel departed Murmansk, Russia, and the time it arrived in the Port of New Orleans.

> Following the termination of the charter party, Elmar and Evandros benefitted from the use of the bunker fuel on board the M/V LION, and supplied by Cockett, because it was consumed during the voyage between Murmansk, Russia and the Port of New Orleans.

Given these allegations, Cockett's conversion/unjust enrichment claim hinges on the timing of the termination of the time charter between Evandros and Charbons Et Fuels SA.  Evandros contends that the conclusory statement of fact regarding the charter's termination is not only factually wrong, but could have been

investigated before seeking arrest of the vessel.  Evandros submits evidence that supports its assertion that the LION had already arrived in the Port of New Orleans at 1845 hours on February 8, 2011 and that, eight days later on February 16, 2011, Charbons cancelled the time charter.  Accordingly, Evandros's evidence supports the proposition that the LION's charterer, Charbons Et Fuels SA, was the party that benefitted from the fuel consumed between Russia and New Orleans.  That is, because the M/V LION's arrival in New Orleans preceded the termination of the time charter, Evandros could not have benefitted from the LION's consumption of the bunker fuel to get to New Orleans.  In light of this evidence disproving Cockett's only factual allegations attempting to link Evandros to its allegations of conversion/unjust enrichment, Cockett has failed to carry its burden of showing reasonable grounds to maintain its Rule B attachment claim against Evandros.

   Accordingly, Evandros's motion to vacate the arrest and attachment is GRANTED.[9]  The Court will release the substitute security filed by Evandros, once appropriate papers are filed.

New Orleans, Louisiana, May 12, 2011

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[9] To the extent Evandros seeks damages for bad faith arrest and attachment, the Court denies without prejudice that request as insufficiently supported.

14